ELECTRONICALLY FILED
COURT OF COMMON PLEAS
Tuesday, November 24, 2020 9:49:59 AM
CASE NUMBER: 2020 CV 04509 Docket ID: 35060690
MIKE FOLEY
CLERK OF COURTS MONTGOMERY COUNTY OHIO

## IN THE COURT OF COMMON PLEAS
## MONTGOMERY COUNTY, OHIO

| | | |
|---|---|---|
| SHAWN ANDERSON<br>5361 Harper's Ferry Ct.<br>Centerville, OH 45459 | )<br>)<br>) | CASE NO.<br><br>JUDGE: |
| Plaintiff, | )<br>)<br>) | |
| v. | )<br>) | |
| GREATER DAYTON REGIONAL<br>TRANSIT AUTHORITY<br>4 S. Main St.<br>Dayton, OH 45402 | )<br>)<br>)<br>)<br>) | **COMPLAINT FOR DAMAGES<br>AND INJUNCTIVE RELIEF** |
| **Serve Also:**<br>Greater Dayton Regional<br>Transit Authority<br>600 Longworth St.<br>Dayton, OH 45402 | )<br>)<br>)<br>)<br>)<br>) | **JURY DEMAND ENDORSED<br>HEREIN** |
| Defendant. | )<br>) | |

Plaintiff SHAWN ANDERSON by and through undersigned counsel, as his Complaint against the Defendant, states and avers the following:

### PARTIES

1. Plaintiff Shawn Anderson is a resident of the city of Centerville, Montgomery County, state of Ohio.

2. Defendant GREATER DAYTON REGIONAL TRANSIT AUTHORITY ("GDRTA") is a city government transit authority that conducts business within the state. The relevant location of the events and omissions of this Complaint took place was at and around its location at 4 S. Main St., Dayton, OH 45402.

3. GDRTA is, and was at all times hereinafter mentioned, Anderson's employer within the meaning of the Americans with Disability Act ("ADA") 42 U.S.C. § 12101, Family and Medical Leave Act ("FMLA") 29 U.S.C. § 2617 et seq., and R.C. § 4112.01(A)(2).

## JURISDICTION & VENUE

4. All of the material events alleged in this Complaint occurred in Montgomery County, Ohio.

5. Therefore, personal jurisdiction is proper over Defendant pursuant to Ohio Revised Code §2307.382(A)(1), (3) and/or (4).

6. Venue is proper pursuant to Civ. R. 3(B)(2), (3) and/or (5).

7. This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

8. Within 180 days of the conduct alleged below, Anderson filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC", Charge No. 473-2020-00943) against Defendant ("EEOC Charge").

9. On or about September 9, 2020 the EEOC issued and mailed a Dismissal and Notice of Rights letter to Anderson regarding the EEOC Charge.

10. Anderson received the Dismissal and Notice of Rights from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1), which has been attached hereto as Plaintiff's Exhibit 1.

11. Anderson has filed this Complaint on or before the 90-day deadline set forth in the Dismissal and Notice of Rights.

12. Anderson has properly exhausted all administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

## FACTS

13. Anderson is a former employee of GDRTA.

14. At all times noted herein, Anderson was qualified for his position with GDRTA.

15. At all times noted herein, Anderson could fully perform the essential functions of his job, with or without a reasonable accommodation.

16. Anderson worked for GDRTA, ending as an operations supervisor, from February 13, 2017, until GDRTA terminated Anderson's employment on or about January 23, 2020.

17. Anderson has depression, anxiety, high blood pressure, and vertigo/motion sickness and thus is in a protected class for his disabilities.

18. Anderson's early employment was generally positive.

19. Anderson had plenty of experience in the field working previously with Southwest Ohio Regional Transit Authority ("SORTA") and was given help by Curtis Hudson (operations supervisor) in getting his initial interview with Rick Bailey (fixed route manager) and Tim McConaughey (operations supervisor – in-house supervisor).

20. Anderson was initially hired as a fixed-route operator and stayed in the role roughly four months.

21. After Anderson completed his driver-training, Thomas Nichols (then-lead operations supervisor) told him that he had seen and heard great things about Anderson and wanted him to move into an operations supervisor role soon too.

22. In or around June 2017, Anderson applied for the operations supervisor position; he was brought into the role full-time on or about July 10, 2017.

23. For the role, Anderson interviewed with Holly Grey-Hughes (HR). His early time in the operation supervisor role was also overall positive.

24. In or around October 2018, however, the situation dramatically deteriorated for Anderson at GDRTA.

25. Around that time, Anderson's former colleague from SORTA, Arnold Isham, was hired into a fixed-route manager position with GDRTA.

26. Isham was one of the primary reasons why Anderson had resigned from SORTA – Isham had a problem with retaliating against employees who reported protected harassment complaints to him.

27. Prior, Anderson had emailed Grey-Hughes, Roland Caldwell (director of transportation), and Chris Cole (chief operations officer) to lobby against Isham's hire and mentioned his previous history with him.

28. Anderson said he had no intent on resigning because of Isham's hire, but that he had still considered it. Despite Anderson's protest, GDRTA hired Isham anyway.

29. In or around August or September 2019, GDRTA entered into a contract with Dayton Public Schools for student bussing.

30. Unfortunately, due to the roughly one-year hiring freeze, GDRTA did not have enough drivers to fulfill the routes.

31. As a stopgap, GDRTA began having its supervisors and managers (those with commercial driving licenses ("CDL[s]") also drive on behalf of the agency. This included Anderson, but he did not mind being back on the road at the time.

32. Notably, Anderson was not required to have a CDL as a qualification for his position with GDRTA.

33. Unfortunately, after Anderson began driving for GDRTA again, his issues with vertigo/motion sickness returned.

34. Throughout Anderson's full life, he had had issues with this vertigo and motion sickness, but it never interfered with him taking the tests for or being granted a CDL.

35. By early 2020, Anderson had had two or three vertigo attacks while driving.

36. On or about January 8, 2020, Anderson was driving a school route.

37. Anderson had a vertigo attack and called into dispatch (specifically to Erica Dowell-Evans, dispatcher supervisor).

38. Dowell-Evans told Anderson to pull over and call Tammey Finch (division manager).

39. In that call, Finch asked if Anderson was able to drive the bus back to the garage.

40. Anderson said he felt safe doing so, he just needed to be off the bus soon due to the motion sickness.

41. Finch also asked him to next time tell her when he expected an attack prior to taking a bus out.

42. Anderson said he'd try, but that the attacks were unpredictable, inconsistent, and he wouldn't know about them until he was already driving.

43. On or about January 10, 2020, Anderson visited his nurse practitioner ("NP") and discussed his vertigo/motion sickness.

44. After some deliberation, they agreed that Anderson should generally stop driving buses for work for awhile to give time to figure out the issue.

45. The NP wrote Anderson a note reflecting the same, citing that the issue may be caused either by the higher driving-level of the buses or possibly the fumes from the diesel engines.

46. Anderson promptly emailed a copy of his medical note to Nichols, Finch, and Mike Pence (on the board of operations).

47. After the appointment, Anderson went into work and was promptly brought into a meeting with Nichols, Finch, and Caldwell.

48. Anderson turned in his medical note, but Nichols, Finch, and Caldwell were not comfortable letting Anderson drive any company vehicle (he was still allowed to drive the non-bus vehicles per his note) while on the restrictions.

49. This medical note, in addition to the previous conversations with GDRTA, gave official notice of Anderson's disabilities to GDRTA.

50. They then placed Anderson on paid administrative leave until he could take and pass a Fitness-for-Duty driving test.

51. On or about January 11, 2020, Anderson emailed the CEO (Mark Donaghy) about his admin leave, complaining that he felt GDRTA was treating him disparately because of his disabilities by forcing him to drive outside the scope of his job functions and then placing him on leave when he could not. This was a protected complaint of discrimination. Anderson received no response.

52. On or about January 13, 2020, Anderson called Dr. Brenda Thomas (director of HR). Anderson reviewed the situation above and asked for advice. This was another protected action.

53. Dr. Thomas, surprisingly, refused to give advice as Anderson was considered management but told him to reach out to his managers about any questions he had.

54. Later that day, Anderson met again with Nichols, Finch, and Caldwell and explained he did not understand why he was forced on leave for being unable to perform tasks that were not in his job functions.

55. This was a fairly uninformative meeting, and Anderson was told to go take Fitness Test on the 15th.

56. Later in that same evening, Anderson received a call from Nichols saying that Anderson had been cleared to return to work.

57. Anderson was surprised by this and mentioned he had not yet taken the Fitness Test. Nichols told him to take the test as scheduled anyway.

58. On or about January 15, 2020, Anderson went to take his Fitness Test. Unfortunately, due to clerical error, he was late to his appointment and the test had to be rescheduled.

59. Anderson called Caldwell about the rescheduled test. Caldwell told Anderson to reschedule the test and to come into work anyway.

60. When Anderson came in later that day he spoke with Nichols about the situation.

61. Nichols told Anderson that GDRTA could not keep him on paid leave and offered Anderson a non-supervisory transit ambassador position in the main Dayton hub.

62. Anderson was not actually on paid leave at this point, despite Nichols' comment.

63. This ambassador position typically pays only $12/hour, substantially less than Anderson was making at that point. This was an adverse employment action against Anderson.

64. Anderson asked why he had been cleared to return to work, but was not actually cleared to return to his position. He also noted he did not want the ambassador position.

65. Nichols said that was the only option for Anderson until he was cleared entirely.

66. Due to the stress of the situation, Anderson's blood pressure began increasing, causing him to feel quite ill. He left early as a result.

67. The next day, on or about January 16, 2020, Anderson met with his NP and mentioned the heightened stress at his job because of the events above. He asked if there were leave of absence options to help deal with this stress.

68. Anderson's NP referred him to a therapist to discuss (his counseling appointment was eventually set in or around mid-February 2020) and mentioned he should look into FMLA.

69. After his appointment, Anderson called Pence to call-off ill and mention he did not have a specific return-to-work date yet.

70. Anderson gave further notice of his medical issues as well. Anderson then emailed Julie Hoffman (leave administrator) asking for information on medical leave.

71. Hoffman said she'd mail Anderson some information about FMLA and short-term disability leave and GDRTA's policies.

72. On or about January 24, 2020, Anderson received a text from Janice Reece (training supervisor) mentioning some "rumors" about Anderson. Anderson did not know what rumors she was asking about.

73. Anderson later heard that Randy (LNU, training manager) was asking about deactivating Anderson's keycard.

74. Anderson texted Janice back asking if it was standard to deactivate keycards during medical leaves.

75. On or about January 27, 2020, Anderson was attempting to verify his sick time on Vista (GDRTA's internal scheduling application); he saw he had been locked out and was told to contact the system administrator.

76. When Anderson checked his physical mail later that day, he found a letter from GDRTA terminating his employment citing no-call/no-shows on January 17, 18, and 22 (days which he had called off sick). Anderson's employment was terminated citing job abandonment.

77. Notably, Anderson had roughly 130 hours' sick-time available at the end of his employment.

78. Defendant's termination of Anderson was an adverse employment action against him.

79. Defendant's purported reason(s) for Anderson's termination was pretextual.

80. Defendant actually terminated Anderson's employment discriminatorily against his disabilities and/or in retaliation against his protected complaints, and/or in a preventative effort against his FMLA.

81. As a result of the above, Anderson has suffered damages, including economic damages, as well as severe emotional distress, anxiety, and depression.

### COUNT I:  UNLAWFUL INTERFERENCE WITH FMLA RIGHTS

82. Anderson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

83. Pursuant to 29 U.S.C. § 2601 *et seq.*, covered employers are required to provide employees job-protected unpaid leave for qualified medical and family situations.

84. GDRTA is a covered employer under the FMLA.

85. Anderson was an employee eligible for FMLA due to his severe health conditions (described *supra*).

86. During his employment, Anderson qualified for and inquired about FMLA leave due to his disabilities because he was terminated.

87. During his employment with GDRTA, Anderson was unable to receive FMLA benefits for his disabilities.

88. Defendant unlawfully interfered with Anderson's exercise of his rights under the FMLA in violation of § 105 of the FMLA and § 825.220 of the FMLA regulations.

89. Defendant's refusal to provide Anderson with information pertaining to FMLA leave and/or permit Anderson to take FMLA leave violated and interfered with his FMLA rights.

90. As a direct and proximate result of Defendant's conduct, Anderson suffered and will continue to suffer damages.

91. As a direct and proximate result of Defendant's conduct, Anderson is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs and reasonable attorneys' fees.

**COUNT II: DISABILITY DISCRIMINATION IN VIOLATION OF R.C. § 4112, *et seq.***

92. Anderson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

93. Anderson is in a protected class for his disabilities (described *supra*).

94. R.C. § 4112 *et seq*. provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's disabilities.

95. Defendant treated Anderson differently than other similarly situated employees based upon his disability.

96. Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by treating Anderson differently from other similarly situated employees outside his protected class.

97. Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying their employment policies in a disparate manner based on Anderson's disability.

98. Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying their disciplinary policies in a disparate manner based on Anderson's disability.

99. Anderson incurred emotional distress damages as a result of Defendant's conduct described herein.

100. As a direct and proximate result of Defendant's acts and omissions, Anderson has suffered and will continue to suffer damages.

## COUNT III: DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA

101. Anderson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

102. Anderson is in a protected class for his disabilities.

103. The ADA provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's disability.

104. Defendant treated Anderson differently than other similarly situated employees based upon his disability.

105. Defendant violated the ADA by treating Anderson differently from other similarly situated employees outside his protected class.

106. Defendant violated the ADA by applying its employment policies in a disparate manner based on Anderson's disability.

107. Defendant violated the ADA by applying its disciplinary policies in a disparate manner based on Anderson's disability.

108. Anderson incurred emotional distress damages as a result of Defendant's conduct described herein.

109. Anderson incurred emotional distress damages as a result of Defendant's conduct described herein.

110. As a direct and proximate result of Defendant's failure to promote Anderson based upon race discrimination, Anderson has suffered and will continue to suffer damages.

## COUNT IV: FAILURE TO ACCOMMODATE

111. Anderson restates each and every prior paragraph of this complaint, as if it were fully restated herein.

112. Anderson informed Defendant of his disabling condition.

113. Anderson requested accommodations (time off from work) from Defendant to assist with his disabilities.

114. Anderson's requested accommodations were reasonable.

115. There was an available accommodation that would have been effective and would have not posed an undue hardship to Defendant.

116. Defendant failed to engage in the interactive process of determining whether Anderson needed an accommodation.

117. Defendant failed to provide an accommodation.

118. Defendant violated R.C. §4112.02 and/or the ADA by failing to engage Anderson in the interactive process.

119. Defendant violated R.C. §4112.02 and/or the ADA by failing to provide Anderson a reasonable accommodation.

120. As a direct and proximate result of Defendant's conduct, Anderson suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

### COUNT V: RETALIATION

121. Anderson restates each and every prior paragraph of this complaint, as if it were fully restated herein.

122. As a result of the Defendant's discriminatory conduct described above, Anderson complained of the discrimination, harassment, and disparate treatment he was experiencing.

123. Subsequent to Anderson's complaints to management about harassment, bullying, and disparate treatment toward him, Defendant took adverse employment actions against Anderson, including terminating his employment.

124. Defendant's actions were retaliatory in nature based on Anderson's opposition to the unlawful discriminatory conduct.

125. Pursuant to R.C. § 4112 *et seq.*, the ADA, it is an unlawful discriminatory practice to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice.

126. As a direct and proximate result of Defendant's retaliatory discrimination against and discharge of Anderson, he has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

**DEMAND FOR RELIEF**

WHEREFORE, Anderson demands from Defendant the following:

a) Issue a permanent injunction:

    i. Requiring Defendant to abolish discrimination, harassment, and retaliation;

    ii. Requiring allocation of significant funding and trained staff to implement all changes within two years;

    iii. Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal

        responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;

    iv.    Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

    v.    Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

b) Issue an order requiring Defendant to expunge his personnel file of all negative documentation;

c) An award against each Defendant for compensatory and monetary damages to compensate Anderson for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

d) An award of punitive damages against each Defendant in an amount in excess of $25,000;

e) An award of reasonable attorneys' fees and non-taxable costs for Anderson's claims as allowable under law;

f) An award of the taxable costs of this action; and

g) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

　/s/ Matthew Bruce　
Matthew G. Bruce (0083769)
　　Trial Attorney
Evan R. McFarland (0096953)
**THE SPITZ LAW FIRM, LLC**
The Spitz Law Firm, LLC
Spectrum Office Tower
11260 Chester Road, Suite 825
Cincinnati, OH  45246
Phone: (216) 291-4744 x173
Fax:　(216) 291-5744
Email: Matthew.Bruce@SpitzLawFirm.com
Email: Evan.McFarland@SpitzLawFirm.com

*Attorneys for Plaintiff Shawn Anderson*

# JURY DEMAND

Plaintiff Shawn Anderson demands a trial by jury by the maximum number of jurors permitted.

　/s/ Matthew Bruce　
Matthew G. Bruce (0083769)

15